Dionisious I. VYTHOULKAS, Sr., and wife, Joan Vythoulkas, individually, and as next of kin of Dionisious Vythoulkas, Jr., Deceased, Plaintiffs.

v.

VANDERBILT UNIVERSITY HOSPITAL, Dr. Lars Larsson, Dr. Deborah M. Bryant, Woodbury-Madison Association, d/b/a Good Samaritan Hospital, and Rutherford Hospital, Defendants.

Court of Appeals of Tennessee, Middle Section, at Nashville.

March 7, 1985.

Permission to Appeal Denied by Supreme Court July 1, 1985.

D. Russell Thomas, Scott Daniel, Daniel, Burton & Thomas, Murfreesboro, for plaintiffs/appellants.

H. Lee Barfield, II, R. Dale Grimes, Bass, Berry & Sims, Nashville, for defendants/appellees.

## OPINION

KOCH, Judge.

We granted this interlocutory appeal to consider an important question concerning the scope of pretrial discovery regarding expert witnesses. Specifically, we are called upon to determine whether a party, through the use of written interrogatories pursuant to Tenn.R.Civ.P. 33, may discover identifying information concerning an adversary's formally retained expert when the expert is not expected to be called as witness at trial. After balancing the policy encouraging parties to seek expert advice with the policy favoring full pretrial disclosure of all relevant matters, we have determined that Tenn.R.Civ.P. 26.02(1) permits the discovery of identifying information concerning an adverse party's formally retained expert who is not expected to be

called at trial without a demonstration that exceptional circumstances exist.[1]

This is a medical malpractice action. Mrs. Joan Vythoulkas gave birth to her son, Dionisious Vythoulkas, Jr., by cesarean section, on August 11, 1980, at the Good Samaritan Hospital in Woodbury. The child began to experience difficulties, and an expert medical team from Vanderbilt University Hospital [hereinafter referred to as "Vanderbilt"] was summoned. When Dr. Lars Larsson, a fellow in neonatology at Vanderbilt, arrived, he performed an umbilical artery catheterization on the boy prior to transferring him to another hospital.

The child was transported to Rutherford Hospital because there was no room at Vanderbilt. He remained there for approximately twenty hours and was then admitted to Vanderbilt. While at Vanderbilt, the boy was under the care of Dr. Deborah M. Bryant, a resident in pediatrics. After arriving at Vanderbilt, the child was found to be infected with coagulase positive staphyloccous. This infection caused the boy to develop an aortic aneurysm which ruptured, causing his death on August 22, 1980.

The Vythoulkas' filed this action on August 11, 1981, in the Circuit Court for Cannon County against Vanderbilt, the Good Samaritan Hospital, Rutherford Hospital, Dr. Lars Larsson, and Dr. Deborah M. Bryant.[2]

The defendants, Vanderbilt, Larsson, and Bryant, filed a set of thirty-one interrogatories on October 23, 1981, seeking to discover the factual basis of the Vythoulkas' action as well as the evidence and legal theory upon which the Vythoulkas' intended to rely. Ten of these questions were designed to elicit identifying information concerning persons having knowledge of relevant facts relating to the plaintiffs'

---

**1.** We address in this opinion only the discovery of the identity of a formally retained but non-testifying expert. We do not deal with the identity or opinions of informally consulted experts who have not been retained to assist in trial preparation, the opinions of formally retained

but non-testifying experts, or the opinions of second tier experts.

**2.** Subsequently, on July 29, 1982, the Good Samaritan Hospital was dismissed as a defendant. On January 14, 1984, the plaintiffs voluntarily dismissed Rutherford Hospital as a defendant.

claim, experts retained or specially employed by the plaintiffs in anticipation of litigation who were not expected to testify, and persons advising the plaintiffs on the accepted standard of professional practice and the national standard of care.[3]

The two interrogatories we are called upon to examine on this appeal are:

12. Please state whether plaintiffs and/or their representatives have retained or specially employed an expert in anticipation of litigation or preparation for trial who is not expected to be called as a witness at trial.

13. If the answer to the foregoing question is in the affirmative, please state the full name, address and telephone number of said expert retained or specially employed by plaintiffs and/or their representatives in anticipation of litigation of preparation for trial who is not expected to be called as a witness at the trial of this cause.

The plaintiffs served their first set of interrogatories on the defendants on November 12, 1981, less than one month after the filing of the defendants' interrogatories. Vanderbilt answered these interrogatories on March 13, 1982. Dr. Larsson answered them on March 26, 1982, and Dr. Bryant answered them on July 1, 1983.

The plaintiffs submitted answers to the defendants' interrogatories on July 28, 1983, almost two years after the interrogatories were first served on them. The plaintiffs did not identify one expert in these interrogatories.[4] They stated that they were unable to provide the names of any of the experts who would testify at trial because "discovery has not been completed and it is too early to determine the nature of the medical proof that will be required or the experts who may testify." The plaintiffs also refused to respond to any of the ten interrogatories requiring them to provide identifying information

concerning any non-testifying experts retained in anticipation of litigation or other persons advising the plaintiffs on the accepted standard of professional practice and the national standard of care. Specifically, in answer to the defendants' twelfth interrogatory, the plaintiffs stated:

At this time we cannot state what experts may or may not be called and object to the information sought in this question on the grounds that it invades Plaintiffs' work product privilege.

In answer to the defendants' thirteenth interrogatory, the plaintiffs stated:

Plaintiffs object to the information sought in this question on the grounds that it violates their work product privilege, but again would show that if any witness covered by such privilege is to be called at trial, they will amend this answer by giving the specific name and address sufficiently in advance of the trial to allow Defendants adequate opportunity for full discovery of said witnesses' knowledge and proposed testimony.

On August 30, 1983, Vanderbilt filed a motion pursuant to Tenn.R.Civ.P. 37.01 seeking an order to compel the plaintiffs to answer its twelfth and thirteenth interrogatories. No action was taken on this motion at that time.

On January 17, 1984, the plaintiffs filed their response to Dr. Larsson's motion for summary judgment which had been filed approximately two years earlier on March 12, 1982. In support of their claim that Dr. Larsson was guilty of malpractice, the plaintiffs for the first time revealed the identity of two experts they had retained. They did so by filing affidavits prepared by these experts to the effect that the two physicians who had treated the plaintiffs' infant son had acted negligently by not observing Vanderbilt's policies regarding sterile procedures and by not detecting and

---

**3.** See questions 3, 4, 8, 9, 12, 13, 15, 16(h), and 27.

**4.** However, in their answer to the defendants' eighth interrogatory, the plaintiffs conceded

that they were receiving assistance from unidentified "non-treating experts who reviewed the files after the filing of the suit."

treating the resulting infection in a timely manner.

The trial court conducted a hearing on the defendants' motion to compel answers to their interrogatories on January 20, 1984, and on June 25, 1984, entered an order granting the defendants' motion and directing the plaintiffs to answer the defendants' twelfth and thirteenth interrogatories. The trial court also granted the plaintiffs' motion for an interlocutory appeal pursuant to Tenn.R.App.P. 9. This order was re-entered on August 9, 1984, because the plaintiffs had not been properly notified of the entry of the June 25, 1984, order. The plaintiffs properly filed their application to appeal in this Court, and on August 30, 1984, we granted their application for interlocutory appeal.

## I.

### The Development of Pretrial Discovery in Tennessee [5]

The process leading ultimately to the promulgation of Tenn.R.Civ.P. 26 tracks the decisions of Tennessee's courts with regard to pretrial discovery. It demonstrates that there has been a consistent trend since 1959 favoring broad pretrial discovery for the purpose of enabling litigants to prepare themselves fully for trial and to enhance their ability to present to the jury and the trial court all the pertinent facts and legal theories so that a just decision will be rendered. The trial court's decision in this case is in keeping with this trend.

For many years prior to 1959, the use of pretrial discovery in Tennessee's courts was limited and fraught with risk. Pretrial depositions were available in narrow circumstances such as depositions *de bene esse* to prevent the loss of a witness' testimony through death or absence. *McFarlane v. Moore*, 1 Tenn. (1 Overt.) 32 (1805). See also Chapter 1, Public Acts of 1794; Chapter 6, Public Acts of 1801; and Chapter 100, Public Acts of 1811. However,

parties were not subject to these deposition rules, *Hubbard v. Haynes*, 189 Tenn. 335, 337, 225 S.W.2d 252, 253 (1949), and the party electing to take a deposition was required to make the witness its own for all purposes. During this time, engaging in pretrial discovery in Tennessee, as in other jurisdictions, was looked upon with disdain as a "fishing expedition." Because of this attitude, expert commentators such as Professor Wigmore observed that trial preparation and practice were based upon the "sporting theory of justice" wherein the outcome of a case depended primarily upon the fortuitous availability of the evidence or upon the skill and strategy of counsel. See A. Holtzoff, *The Elimination of Surprise in Federal Practice*, 7 Vand.L.Rev. 576, 578 (1954), and 8 C. Wright & A. Miller, *Federal Practice and Procedure* Section 2001, at 18–19 (1970) [hereinafter cited as "Wright & Miller"]. Mr. Justice Henry has noted in this regard that the "profession was committed to the long prevailing practice of trial by ambush." *Seaboard Coastline Railroad Co. v. Hughes*, 521 S.W.2d 558, 560 (Tenn.1975). See also *Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn.App.1981).

Reacting with dissatisfaction to this state of affairs, many states began to permit the use of depositions for discovery and for the purpose of obtaining evidence. 4 J. Moore, J. Lucas & J. Grotheer, Jr., *Moore's Federal Practice* Paragraph 26.01[2] (1984) [hereinafter referred to as *"Moore's Federal Practice"*]. The Federal courts followed this trend in 1938 with the adoption of the first Federal Rules of Civil Procedure. According to many commentators, the new discovery procedures contained in these rules were intended to aid in the ascertainment of truth by eliminating or minimizing the chance of surprise and to deter frivolous lawsuits by promoting settlements thereby saving trial time. See *Moore's Federal Practice*, Paragraph 26.-02[2], and Wright & Miller Section 2001, at 15. See also W. Brazil, *The Adversary*

---

5. This section has been abridged by deleting certain portions of the discussion of the historical development of the Tennessee Rules of Civil Procedure.

*Character of Civil Discovery: A Critique and Proposals for Change,* 31 Vand.L.Rev. 1295, 1298–99 (1978); H. Dodson, *The Tennessee Discovery Deposition Act,* 26 Tenn. L.Rev. 468, 474 (1959); and A. Holtzoff, *The Elimination of Surprise in Federal Practice,* 7 Vand.L.Rev. 576, 577 (1954).

Following the enactment of these rules, the United States Supreme Court, reflecting the change in attitude toward pretrial discovery, observed:

> No longer can the time-honored cry of "fishing expedition" serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession.
>
> *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 392 (1947).

See also *United States v. Proctor & Gamble Co.,* 356 U.S. 677, 682–83, 78 S.Ct. 983, 986–87 (1958).

The enactment of the Federal Rules of Civil Procedure resulted in closer scrutiny being given to Tennessee's discovery practices. Thus, within two years after the enactment of the Federal rules, calls for reform in Tennessee's discovery procedures were being made. See E. King, *Discovery Before Trial in Actions at Law in Tennessee,* 16 Tenn.L.Rev. 438, 441 (1940), and W. Armstrong, *Tennessee Procedure Should Be Studied: A Modest Proposal,* 16 Tenn. L.Rev. 379 (1940).

This call for a comprehensive statute governing pretrial discovery was finally answered in 1959 when the General Assembly enacted the Deposition Law of 1959 [Chapter 54, Public Acts of 1959]. The substance of this law was virtually identical to the discovery provisions of the Federal Rules of Civil Procedure as they existed in 1959. The drafters of this bill found this similarity desirable because the Federal rules were being found workable and because there was a growing body of federal precedent to aid in their interpretation. R. Lanier, *Discovery in Tennessee—A Survey,* 3 Mem.St.U.L.Rev. 1 (1972), and H. Dodson, *The Tennessee Discovery Deposition Act,* 26 Tenn.L.Rev. 468 (1959).

During the legislative debates concerning the Deposition Law of 1959, its sponsor in the House of Representatives, Representative Wilson Sims of Nashville, explained its effect as follows:

> Before a lawsuit comes to court, and before we impanel a jury or begin the trial before a judge, we will have the opportunity to shake down a lawsuit and get out of the lawsuit all of the mystery, all of the game work and guess work, and get down to what is the real issue involved.

He explained further that were the bill to pass,

> We will know on what issues it is necessary to prepare the case; we will know on what issues it is unnecessary to prepare the case. We will know what issues we have to prepare legal arguments for; what witnesses we have to subpoena, and all of the things that will help us to get to the real issue in the lawsuit.

The bill passed overwhelmingly.

The passage of this law caused a marked departure from prior practice in Tennessee and promoted the publication of a number of articles by the bench and bar discussing how the new discovery procedures would work. See W. Russell, *The Deposition Act of 1959,* 31 Tenn.L.Rev. 440 (1964), and H. Dodson, *The Tennessee Discovery Deposition Act,* 26 Tenn.L.Rev. 468 (1959). The Dean of the University of Tennessee School of Law also prepared an article describing the tactical advantages of discovery.[6] With specific regard to the question at issue on this appeal, Dean Wicker wrote:

> In devising cross-strategy, you will want to know what your adversary's tactics are going to be. One way to get an

---

**6.** Dean Wicker was later retained by the Tennessee Law Revision Commission to prepare a comparative study of civil practice in Tennessee. He assisted in developing the recommended rules upon which the first Tennessee Rules of Civil Procedure were based.

inkling of his plan of campaign is to learn what witnesses he has interviewed. You are also entitled to know what experts your adversary has consulted, even if he does not plan to use them as witnesses. It may be that he has consulted an expert whom he does not intend to put on the witness stand, because he does not like what his testimony would be. However, such an expert has examined the subject matter of the lawsuit, and is a person having knowledge of relevant facts. Hence the consulting party is required to disclose his name.

W. Wicker, *Tactical Advantages From the Use of Discovery*, 27 Tenn.L. Rev. 323, 334 (1960).

The development of Tennessee's discovery procedures did not end with the enactment of the Deposition Law of 1959. On January 26, 1970, the Tennessee Supreme Court adopted the Tennessee Rules of Civil Procedure. These rules expanded the scope of permissible discovery even further by authorizing the discovery of information that might lead to the discovery of other admissible evidence. In all other respects, these rules were substantially similar to the Deposition Law of 1959. The General Assembly passed House Joint Resolution No. 225 in February, 1970 endorsing these rules, and they became effective on January 1, 1971.

The Tennessee Rules of Civil Procedure remained unchanged until January 31, 1979, when the Tennessee Supreme Court entered an order revising certain of the rules. With specific regard to Tenn.R. Civ.P. 26, the Court adopted changes that made Tennessee's rule conform substantially to the 1970 revisions of the Federal Rules of Civil Procedure.[7] These amendments were approved by the General Assembly in May, 1979 by the adoption of the House Joint Resolution No. 164.

The Tennessee Supreme Court amended Tenn.R.Civ.P. 26 again in 1984. This amendment to Tenn.R.Civ.P. 26.02(1) was specifically intended to give the trial court more authority to deal with abuses of the discovery process. The General Assembly approved this amendment in May, 1984 when it adopted Senate Joint Resolution No. 142.

■ The Tennessee Rules of Civil Procedure are procedural in nature and are not intended to affect substantive rights. Thus, while the interrogatories at issue on this appeal were filed prior to the 1984 amendment to Tenn.R.Civ.P. 26, the propriety of the trial court's action will be ascertained in light of Tenn.R.Civ.P. 26 as it exists presently. See *Strickland v. Strickland*, 618 S.W.2d 496, 498 (Tenn.App.1981).

■ The discovery of the identity of experts who have been retained in preparation for litigation and the substance of their opinions and conclusions is at the "hazy frontier" of the discovery process. *Hickman v. Taylor*, 329 U.S. 495, 513–14, 67 S.Ct. 385, 395 (1947). No absolute rules can be fashioned because the propriety and extent of permissible discovery will depend upon the unique facts of each case and the careful balancing of two laudable goals: first, promoting fairness through full disclosure of all relevant information and second, encouraging counsel to be fully prepared. See S. Cohn, *The Work-Produce Doctrine: Protection, Not Privilege*, 71 Geo.L.J. 917, 920 (1983); M. Graham, *Discovery of Experts Under Rule 26(b)(4) of the Federal Rules of Civil Procedure: Part Two, An Empirical Study and a Proposal*, 1977 U.Ill.L.F. 169, 194 [hereinafter cited as "Graham II"].

\* \* \* \* \* \*

Subdivisions (3) and (4) of Rule 26.02 provide detailed rules in the heretofore uncharted areas of discovery of work product and expert testimony.

---

**7.** The official Committee Comment to the 1979 amendments to Tenn.R.Civ.P. 26 provides, in part:

Rules 26 through 37, inclusive, relating to depositions and discovery, have been amended to conform substantially but not identically to Rules 26 through 37, inclusive, of the Federal Rules of Civil Procedure.

## II.

### *Scope of Discovery Permitted by Tenn.R.Civ.P. 26*

The present system of discovery contained in Tenn.R.Civ.P. 26 should be construed liberally to permit the broadest discovery possible. The Tennessee Supreme Court has held in this regard:

> We think that discovery in civil action is a proper procedural aid for the parties to use in their case in advance of trial and should be given a broad and liberal interpretation. The courts in modern times are encouraging the use of discovery and deposition because it operates with desirable flexibility under the discretionary control of the trial judge and this is the logical method of preventing surprise and permitting both the court and counsel to have an intelligent grasp of the issues to be litigated and knowledge of the facts underlying them.
>
> *Harrison v. Greeneville Ready-Mix, Inc.*, 220 Tenn. 293, 302, 417 S.W.2d 48, 52 (1967).

See also *State ex rel. Pack v. West Tennessee Distributing Co.*, 58 Tenn.App. 306, 311, 430 S.W.2d 355, 357 (1968); and *Southeastern Fleet Leasing, Inc. v. Gentry*, 57 Tenn.App. 162, 169, 416 S.W.2d 773, 777 (1966). Tenn.R.Civ.P. 26.02(1) codifies prior court decisions permitting the discovery of any relevant matter that is not privileged. Specifically, it recognizes prior judicial decisions permitting the discovery of

> the identity and locations of persons having knowledge of any discoverable matter.

See *Strickland v. Strickland*, 618 S.W.2d 496, 500 (Tenn.App.1981); *Reed v. Allen*, 522 S.W.2d 339, 341 (Tenn.App.1974); and *State ex rel. Pack v. West Tennessee Distributing Co.*, 58 Tenn.App. 306, 314–15, 430 S.W.2d 355, 358–59 (1968). These decisions and others recognize that under Tennessee practice, there is a fundamental difference between the identity of a witness or potential witness and the substance of the witnesses' testimony. *Medic Ambulance Service, Inc. v. McAdams*, 216 Tenn.

304, 317, 392 S.W.2d 103, 109–110, (1965); *Lutz v. John Bouchard and Sons, Co.*, 575 S.W.2d 7, 13 (Tenn.App.1974); *State ex rel. Pack v. West Tennessee Distributing Co.*, 58 Tenn.App. 306, 314, 430 S.W.2d 355, 358 (1968).

While the reasons for permitting liberal discovery of the identity of expert consultants are many, the most prominent include enabling counsel to determine whether his adversary's case is predicated upon a particular school of thought and to prepare fully for cross examination, impeachment, or rebuttal of the expert's conclusion should the decision ultimately be made to call the expert as a witness. *State ex rel. Pack v. West Tennessee Distributing Co.*, 58 Tenn.App. 306, 314, 430 S.W.2d 355, 358 (1968). See also M. Graham, *Discovery of Experts Under Rule 26(b)(4) of the Federal Rules of Civil Procedure: Part One, An Analytical Study*, 1976 U.Ill.L.F. 895, 934 n. 148 [hereinafter cited as "Graham I"].

Tenn.R.Civ.P. 26.03, like the judicial decisions upon which it is based, also makes it clear that the course of pretrial discovery is, in large measure, left to the discretion of the trial judge and that the exercise of this discretion is based upon the broad parameters of the rules and the fundamental notion of fairness. *Harrison v. Greeneville Ready-Mix, Inc.*, 220 Tenn. 293, 301–02, 417 S.W.2d 48, 51–52 (1967), and *Ivey v. State*, 207 Tenn. 438, 443–44, 340 S.W.2d 907, 909 (1960). See also J. Friedenthal, *Discovery and Use of an Adverse Party's Expert Information*, 14 Stan.L.Rev. 455, 488 (1962).

## III.

### *The Scope of the Protection of the Work-Product Doctrine*

The protection of an attorney's work-product from automatic discovery was first fashioned by the United States Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 516, 67 S.Ct. 385, 396 (1947). It was intended to augment the traditionally narrow attorney-client privilege. F. James,

*Civil Procedure* Section 6.9, at 204 (1965). The United States Supreme Court specifically held that the memoranda, written and oral statements, and mental impressions of an attorney gained in the process of preparing for a case were not protected by the attorney-client privilege but rather were shielded by the public policy against permitting unwarranted inquiries into the files and mental impressions of an attorney. *Hickman v. Taylor*, 329 U.S. 495, 508–10, 67 S.Ct. 385, 392–93 (1947). This protection is not a "privilege" for the purpose of Tenn.R.Civ.P. 26.02(1). F. James, *Civil Procedure* Section 6.9, at 203 (1965). See also D. Paine, *Tennessee Law of Evidence* Section 96 (1974). It does not provide an absolute shield from discovery; rather it is qualified and can be overcome upon a proper showing. *Southeastern Fleet Leasing, Inc. v. Gentry*, 57 Tenn.App. 162, 172, 416 S.W.2d 773, 778 (1967).

The rationale for the protection of an attorney's work-product has been stated in different ways. Most frequently, courts have found that one of the primary purposes of the protection is to protect the work of a diligent lawyer from unwarranted invasion by a less diligent adversary. *Hickman v. Taylor*, 329 U.S. 495, 516, 67 S.Ct. 385, 396 (1947) (Jackson, J., concurring); *Jordan v. State ex rel. Williams*, 217 Tenn. 307, 330, 397 S.W.2d 383, 393 (1965); *Medic Ambulance Service, Inc. v. McAdams*, 216 Tenn. 304, 319, 392 S.W.2d 103, 110 (1965); and *State ex rel. Pack v. West Tennessee Distributing Co.*, 58 Tenn.App. 306, 314, 430 S.W.2d 355, 358 (1968).[8] Others have stated that it promotes the adversarial system of justice.

See F. James, *Civil Procedure* Section 6.9, at 205 (1965). Still others have noted that it is designed to encourage thorough pretrial preparation. *Lutz v. John Bouchard and Sons Co.*, 575 S.W.2d 7, 13 (Tenn.App. 1974). See also S. Cohn, *The Work-Product Doctrine: Protection, Not Privilege*, 71 Geo.L.J. 917, 920 (1983), and Wright & Miller Section 2032.

Tennessee responded to the *Hickman v. Taylor* decision by including in the Deposition Law of 1959 a provision that enabled the trial court to prevent discovery if the lawyer seeking access to his adversary's work product had not "used due diligence to discover such things for himself."[9] This authority of the trial court to prevent the improper use of discovery was carried over into Tenn.R.Civ.P. 26.03 when it was adopted in 1970 and was further refined as a result of the adoption of the 1979 amendments to Tenn.R.Civ.P. 26. Recognizing the distinction that had been made earlier between the identity of a witness or expert and the substance of the expert's opinion,[10] these 1979 amendments undertook to deal for the first time with the "uncharted areas" concerning discovery of work-product [Tenn.R.Civ.P. 26.02(3) ] and the penumbral protection of expert testimony [Tenn.R. Civ.P. 26.02(4) ].[11]

As a result of the 1979 amendments, Tenn.R.Civ.P. 26.02(1) embodies a broad policy favoring discovery of any relevant matter that is not privileged. Then, Tenn.R.Civ.P. 26.02(3) and (4) contain qualifications to this policy for work-product and "facts known and opinions held by experts" respectively. By including these

8. Various commentators have differed about the wisdom of this rationale. Compare A. Holtzoff, *The Elimination of Surprise in Federal Practice*, 7 Vand.L.Rev. 576, 577 (1954) with J. Friedenthal, *Discovery and Use of an Adverse Party's Expert Information*, 14 Stan.L.Rev. 455, 479 (1962). See also Comment, *Basic Survey of Work Product in Federal and State Jurisdictions in Civil and Criminal Procedures*, 35 Tenn.L. Rev. 474, 475 n. 13 (1968).

9. Chapter 54, Section 5, Public Acts of 1959 [codified at Tenn.Code Ann. Section 24–1205 (repealed 1972) ]. See *Jordan v. State ex rel.*

*Williams*, 217 Tenn. 307, 330, 397 S.W.2d 383, 393 (1965), and *Lutz v. John Bouchard and Sons Co.*, 575 S.W.2d 7, 13 (Tenn.App.1974). See also H. Dodson, *The Tennessee Discovery Deposition Act*, 26 Tenn.L.Rev. 468, 470–71 (1959).

10. *State ex rel. Pack v. West Tennessee Distributing Co.*, 58 Tenn.App. 306, 314, 430 S.W.2d 355, 358 (1968). See also Graham II, at 173.

11. See Tenn.R.Civ.P. 26, Committee Comment— 1979 Amendments and F. James, *Civil Procedure* Section 6.9, at 205 (1965).

qualifications within the broad scope of Tenn.R.Civ.P. 26.02(1), we conclude that the framers of the rule intended to preserve the distinction between a person's identity and the substance of his opinions. This is consistent with earlier rulings of this Court that the identity of a witness is not part of an attorney's work-product because witnesses do not belong to one party more than the other. *MacDonnell v. Blankenship*, 57 Tenn.App. 224, 227, 417 S.W.2d 713, 714 (1967).[12] It is also evidence that the framers of the rules chose to control discovery not through narrowly defining its scope but rather by vesting in the trial judge sufficient authority to control the process by making orders "which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."

## IV.

### *Applicable Federal Precedents*

■ Our courts have been assisted in their construction of the Tennessee Rules of Civil Procedure by analyzing the precedents construing analogous Federal Rules of Civil Procedure, *Bowman v. Henard*, 547 S.W.2d 527, 530 (Tenn.1977), and *Marlowe v. First State Bank of Jacksboro*, 52 Tenn.App. 99, 105, 371 S.W.2d 826, 828–29 (1962). However, our reliance upon these precedents should always be tempered with the recognition that Tennessee's common law regarding procedure may differ from the federal common law. Thus, any doubt with regard to whether federal construction of the Federal Rules of Civil Procedure or Tennessee's common law controls a question of procedure should be resolved in favor of Tennessee's common law.

The federal courts are hopelessly split concerning the issue before us. The major-

ity view concludes, as we have, that Fed.R. Civ.P. 26(b)(1) permits a party to discover the identity of an opponent's formally retained expert who is not expected to testify at trial without being required to demonstrate that exceptional circumstances exist. *Baki v. B.F. Diamond Construction Co.*, 71 F.R.D. 179, 181–82 (D.Md.1976), and *Sea Colony, Inc. v. Continental Insurance Co.*, 63 F.R.D. 113, 114 (D.Del.1974).[13] However, there is a strong minority view best embodied in *Ager v. Jane C. Stormont Hospital and Training School for Nurses*, 622 F.2d 496, 503 (10th Cir.1980).[14]

We do not find the federal decisions holding that the identity of a non-testifying expert cannot be discovered without a showing of exceptional circumstances to be persuasive. These decisions are based in large measure on what Professor Wright has termed to be a cryptic committee comment to the 1970 amendments to Fed.R. Civ.P. 26. This comment states:

> As an ancillary procedure, a party may on a proper showing require the other party to name experts retained or specially employed, but not those informally consulted.
>
> > Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, Advisory Committee's Comment 48 F.R.D. 485, 504 (1970).

Courts refusing to permit the discovery of the identity of a non-testifying expert have equated the comment's "proper showing" requirement with the "exceptional circumstances" required to discover the substance of a non-testifying expert's opinion. This comment has not been incorporated into the Tennessee Rules of Civil Procedure and has not been endorsed by the courts of this state. It runs contrary to the development

---

**12.** See also *State ex rel. Pack v. West Tennessee Distributing Co.*, 58 Tenn.App. 306, 430 S.W.2d 355 (1968) in which this Court held that the names of expert witnesses could be discovered even if their actual reports could not.

**13.** See also *Roesberg v. Johns-Manville Corp.*, 85 F.R.D. 292, 303 (E.D.Pa.1980); *In re Folding Carton Antitrust Litigation*, 83 F.R.D. 256, 259 (N.D.Ill.1979); and *Weiner v. Bache Halsey*

*Stuart, Inc.*, 76 F.R.D. 624, 628 (S.D.Fla.1977). See also Moore's Federal Practice Paragraphs 26.57[1] and 26.66[4] and Wright & Miller Section 2032.

**14.** See *In re Sinking of Barge "Ranger I"*, 92 F.R.D. 486, 488 (S.D.Tex.1981), and *Perry v. W.S. Darley & Co.*, 54 F.R.D. 278, 280 (E.D.Wis.1971).

of discovery in Tennessee in that it fails to recognize the fundamental difference between being required to identify a formally retained expert and being required to disclose the substance of this expert's opinion.

The problems described by the federal courts following the *Ager* decision that could result from requiring the disclosure of a non-testifying expert's identity are, in our mind, outweighed by the benefits resulting from disclosure. The fear that an expert whose opinion is unfavorable to the consulting party will become an adverse witness is mitigated by the practical consideration that as a general rule, such experts will not discuss the case with others, Graham I, at 933–34, and by the use of a contractual agreement wherein an expert witness agrees not to disclose his opinion without the approval of the party who retained him. See Graham II, at 195. In addition to these practical considerations, a party always has the right to seek a court order pursuant to Tenn.R.Civ.P. 26.03 to prevent the discovery on grounds applicable to the unique circumstances of the particular case.

## V.

### *The Relevancy of the Identity of Formally Retained, Non-testifying Experts*

The plaintiffs, relying upon *Trainor v. Young*, 348 So.2d 1004 (La.App.1977), argue that the identity of an expert who has been formally retained to assist in preparation for trial but who is not expected to testify is not relevant and, therefore, not discoverable under Tenn.R.Civ.P. 26.02(1). We disagree.

While it is true that relevancy is the most important criteria in Tenn.R.Civ.P. 26.02(1), Wright & Miller Section 2008, at 41, this criterion should be construed liberally with common sense rather than with narrow legalisms. *Moore's Federal Practice* Paragraph 26.56[1], at 26–94, and Wright & Miller Section 2008, at 45. The phrase "relevant to the subject matter involved in the pending action" is synonymous with "germane" or "bearing on the subject mat-

ter." See *Local 13, Detroit Newspaper Union v. N.L.R.B.*, 598 F.2d 267, 271 (D.C. Cir.1979). In this regard, the United States Supreme Court has construed the relevancy requirement in Fed.R.Civ.P. 26(b)(1) as follows:

> The key phrase in this definition—"relevant to the subject matter involved in the pending action"—has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case. (citation omitted). Consistently with the notice-pleading system established by the Rules, discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues. (citation omitted). Nor is discovery limited to the merits of the case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits.

> *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, (1978).

■ We find in this case that the identity of the plaintiffs' retained experts is relevant even if they are not expected to testify at trial because their identity can help to define and clarify the issues in the case. In cases involving professional conduct, especially ones wherein there is a divergence in professional opinion, knowledge of an opponent's expert's identity alone will be of material assistance in trial preparation because the expert may be a person identified with a particular school of thought. See Graham I, at 934 n. 148. Having the benefit of this information will aid counsel in precisely defining the legal issues involved and in developing and presenting only those facts needed to reach a proper result. This is especially helpful in medical malpractice cases wherein the triers of fact are often at the mercy of two sets of competing experts who are testifying concerning highly technical matters and are offering

subjective opinions concerning the proper standard of care.[15]

## VI.

### Different Standards for Medical Malpractice Actions

In their application for an interlocutory appeal and again in their brief, the plaintiffs call upon this Court to impose stringent conditions upon the discovery of nontestifying medical experts who have been retained to assist plaintiffs in medical malpractice review actions. They justify their request on the empirically unsubstantiated assertion [16] that medical experts, fearing ostracism by their peers, will be reluctant to discuss medical malpractice cases with plaintiff's counsel for fear that their identities will be revealed. They argue that if the identity of a formally retained but nontestifying expert must be disclosed, the ability of plaintiffs in medical malpractice actions to find expert witnesses will be seriously impaired.

Like the United States Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385, 392 (1947), we are required to construe the Tennessee Rules of Civil Procedure not just in terms of the manner in which they effect the particular litigants but also in light of the "limitless situations where the particular kind of discovery" involved might be sought. We cannot by judicial fiat engraft standards for discovery in medical malpractice cases that do not already exist in Tenn.R.Civ.P. 26. We have examined the discovery rules and the history surrounding their enactment and find no basis to establish standards for medical malpractice cases higher than those that would be applied in any other case involving experts who have been retained to assist in trial preparation but who are not expected to testify.[17] As compelling as the plaintiff's "ostracism" theory might be, it should not be directed at this Court but rather to those who have the authority to change the Tennessee Rules of Civil Procedure.

## VII.

### Conclusion

 For the reasons stated herein, we find that Tenn.R.Civ.P. 26.02(1) permits the discovery of identifying information concerning an adverse party's formally retained expert who is not expected to be called at trial and that this information can be discovered without demonstrating that exceptional circumstances exist. Thus, we find that the trial court did not err when it ordered the plaintiffs to respond to the defendants' interrogatories seeking this information.

The decision of the trial court is, therefore, affirmed, and the case is remanded for further proceedings.

The costs of this appeal are taxed against the plaintiffs and defendants in equal proportions.

CANTRELL, J., concurs.

TODD, P.J., filed separate dissenting opinion.

---

**15.** The former presiding justice of the Appellate Division, Supreme Court, State of New York, described the problem thusly:

> Under present procedure, where the medical testimony comes from no objective or necessarily qualified source, and only through the hirelings of the parties, partisan experts, medical mouthpieces, the jury is more apt to be confused than enlightened by what it hears. It hears black from one expert, white from the other, a maximizing or minimizing of injuries in accordance with the interest of the source of payment for the testimony.
>
> D. Peck, *Impartial Medical Testimony: A Way to Better and Quicker Justice*, 22 F.R.D. 21, 22 (1959).

**16.** While the plaintiffs offer no factual substantiation for this assertion, a similar argument appears in *Halldin v. Petterson*, 39 Wis.2d 668, 159 N.W.2d 738, 741 (1968). The Supreme Court of Wisconsin cited no authority for this proposition, and it would be improper for us to take judicial notice of this phenomenon. See also *Ager v. Jane C. Stormont Hospital & Training School for Nurses*, 622 F.2d 496, 503 (10th Cir.1980).

**17.** We are also sympathetic with plaintiffs' counsel's concern about experts who have already been given assurances that their identity will not be revealed. However, such agreements cannot shield otherwise relevant information from discovery. *Edgar v. Finley*, 312 F.2d 533, 535–36 (8th Cir.1963).

TODD, Presiding Judge, dissenting.

Discovery is designed to enable each party to bring before the court all available evidence favorable to his cause and to be aware in advance of evidence which may be presented by his adversary.

Defendants ask that discovery be enlarged to inform them of the names of persons who may have expressed an opinion but who will not testify. Defendants profess to need this information in order to evaluate the strength of plaintiffs' case and thus determine what if any out of court settlement to offer.

Plaintiffs respond that, because of fear of professional retaliation, their consultants required a pledge that their names would not be disclosed and that they would not be required to testify.

Shall the courts accept at face value the innocent protestations of defendants and grant them access to a name, thereby forcing plaintiffs' counsel to betray a promise to his medical counsellors, or shall the courts deny defendants the name of the counsellor to protect the promise of counsel from betrayal and protect the medical counsellors from the retaliation they fear?

The time has come for restraint of the pervasive spread of discovery to the inconvenience and damage of innocent third parties. It is enough that citizens must be submitted to inconvenience in order to serve the need of the courts for information and the need of parties to avoid surprise as to testimony. It is too much to impose upon innocent third parties to gratify the curiosity or far fetched motives of litigants.

I recognize and respect the problems of professional men, especially of the medical profession, who wish to be helpful, but not to the extent of incurring the wrath of the profession.

To me this consideration more than counterbalances any slight extra-judicial benefit the defendants might derive from the desired information.

At the very least, the ruling of the majority should be prospective only, and should not affect any pledge of confidentiality made prior to the announcement of the ruling.

I would reverse the order of the Trial Judge and deny the discovery.