IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 25, 1999 Session

## ROBERT VAUGHN ODOM v. MARY JO ODOM

**Appeal from the Chancery Court for Dickson County**
**No. 3564-94     Allen W. Wallace, Judge**

**No. M1999-02811-COA-R3-CV**
**Filed December 5, 2001**

This appeal involves a bitter custody dispute over three children between the ages of nine and fourteen. During the divorce proceeding in the Chancery Court for Dickson County, the parties agreed that the mother would have custody of the children and also agreed on visitation arrangements that accommodated the mother's planned move to another state. Several months after the entry of the divorce decree, the father petitioned to change custody and to hold the mother in contempt for interfering with his relationship with the children. During the ensuing three years, the parties traded allegations of sexual and physical abuse of the children and other misconduct. Following a bench trial in December 1998, the trial court found that there had been a material change in the children's circumstances and granted the father custody of the children. On this appeal, the mother asserts that she was denied due process by the trial court's refusal to require the parties and their children to undergo a psychological examination and that the trial court unlawfully delegated its judicial authority to a psychologist who had been counseling the children. We have determined that the mother received an essentially fair hearing on this custody dispute and, therefore, affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which ALAN E. HIGHERS and DAVID R. FARMER, JJ., joined.

Jeffrey L. Levy, Nashville, Tennessee, for the appellant, Mary Jo Odom.

Karla C. Hewitt, Nashville, Tennessee, for the appellee, Robert Vaughn Odom.

**OPINION**

**I.**

Robert Vaughn Odom and Mary Jo Fielder were married in October 1986 in Georgia, less than one week before Mr. Odom's twenty-fourth birthday. Ms. Odom was already twenty-four years old and had three-year-old and five-year-old sons from a prior marriage. Between 1987 and 1992,

the parties had two sons and a daughter of their own. Mr. Odom joined the Dickson Police Department in 1993, and Ms. Odom worked as a part-time licensed practical nurse.

The parties separated in October 1994. On November 4, 1994, Mr. Odom filed a petition for divorce in the Chancery Court for Dickson County. Ms. Odom counterclaimed for divorce and sought custody of the parties' three children pending the trial. On May 24, 1995, the parties signed a marital dissolution agreement that, among other things, granted sole custody of the children to Ms. Odom and directed Mr. Odom to pay $728 per month in child support. Mr. Odom's visitation rights were established to accommodate Ms. Odom's planned move to West Virginia. On May 26, 1995, the trial court filed a final divorce decree incorporating the parties' marital dissolution agreement.

Ms. Odom and the parties' three children moved to Parkersburg, West Virginia shortly after the entry of the final divorce decree. Mr. Odom soon married Andrea Biele, a nurse with a six-year-old son. Ms. Biele and her former husband had been friends of the parties while they were married and were divorced approximately four months before the parties obtained their divorce.

Less than three months after the entry of the final divorce decree, Mr. Odom petitioned the trial court to change custody and to hold Ms. Odom in contempt for obstructing his telephone calls to his children and for refusing to pay her share of his visitation travel expenses. He also alleged that Ms. Odom, contrary to the marital dissolution agreement, "repeatedly talked negatively about him to the children" in an effort to destroy his relationship with the children. Following a hearing in November 1995, the trial court entered an order on January 3, 1996, denying Mr. Odom's petition.

While this matter was pending, the first of several serious disputes between the parties occurred. On December 31, 1995, after the three children returned to West Virginia from Christmas visitation with Mr. Odom, Ms. Odom and her aunt discovered a suspicious bruise on her six-year-old daughter's chest. On January 2, 1996, at the suggestion of the West Virginia child protective service authorities, Ms. Odom had her daughter examined at a hospital emergency room. Ms. Odom informed the hospital personnel that she was concerned about the bruise because Mr. Odom was "addicted to pornography."[1] Ms. Odom also informed Mr. Odom that she intended to commence judicial proceedings in West Virginia to prevent him from continuing to visit the children.

In February 1996, Mr. Odom, Andrea Odom, and her son began family counseling with a licensed psychologist practicing in Clarksville, Tennessee. Mr. Odom and his new wife were experiencing marital conflicts, and Mr. Odom felt "stressed out" after his children returned to West Virginia and by Ms. Odom's allegations that he had sexually abused their daughter. On February 7, 1996, Mr. Odom filed a second petition to modify custody and to hold Ms. Odom in contempt. He asserted that Ms. Odom was continuing to obstruct telephone visitation with his children and that he was fearful that Ms. Odom was "planning to have him arrested on fictitious or manufactured charges when he returns to West Virginia for his visitation." Approximately one week later, Ms.

---

[1] These statements led to an investigation by the Tennessee Bureau of Investigation. This investigation was closed in November 1997 without conclusive findings or recommendation for prosecution.

Odom commenced proceedings in West Virginia to stop Mr. Odom's visitation. Following a conversation with the West Virginia judge assigned to the case, the trial court declined to relinquish jurisdiction to the West Virginia courts. As far as we can tell, the West Virginia proceeding ended at this point without a definitive conclusion.

In September or October 1997, Ms. Odom and the parties three children moved to Meridian, Idaho. After Ms. Odom declined to permit him to exercise his scheduled October visitation, Mr. Odom filed an amended petition asserting, in addition to the allegations in his February 1997 petition, that Ms. Odom had moved to Idaho "to deter or defeat" his visitation rights.

The parties' three children traveled to Tennessee for Christmas visitation in December 1997 and returned to Idaho on January 3, 1998. The following day, Mr. Odom became anxious about his children and had an argument with his wife. When his wife stated that she was going to her father's house, Mr. Odom grabbed his service revolver and began waiving it around to convince her not to leave the house. Mr. Odom never fired the weapon and eventually unloaded it and threw it on the bed. Mr. Odom's wife summoned the police, and by the time they arrived, Mr. Odom had calmed down. He was examined at the hospital following the incident, and he and his wife had a session with their family therapist on January 5, 1998. Mr. Odom took medication for his anxiety for several days and returned to duty following two weeks of leave.

During the children's visitation in June 1998, Mr. Odom and his wife decided to include them in their family counseling sessions because they were concerned about the children's behavior. They specifically asked the psychologist to interview Mr. Odom's nine-year-old daughter separately. During her first two interviews, the child told the psychologist that her fifteen-year-old half-brother had been sexually abusing her and that he, in fact, was the one who had caused the bruise on her chest that had precipitated the sexual abuse investigation in 1996. The girl's two brothers also ascribed conduct to the same half-brother that the psychologist concluded was physical and sexual abuse. The psychologist reported her findings to Mr. Odom and to the authorities in Tennessee and Idaho.

On August 7, 1998, Mr. Odom petitioned for a restraining order to prevent Ms. Odom (now Kiesig)[2] from removing the children from his custody. He supported this petition with an affidavit from the family's psychologist detailing the children's accounts of their half-brother's sexual and physical abuse. Ms. Kiesig opposed Mr. Odom's petition, stating that it was "totally false." Following a hearing, the trial court entered an order on September 18, 1998, restraining Ms. Kiesig from removing the children from Mr. Odom's custody and granting her supervised visitation.

In October 1998, Ms. Kiesig requested the trial court to appoint an independent psychiatrist to examine the parties and their three children. She also requested an emergency hearing in chambers for the purpose of providing the trial court information indicating that the children were

---

[2]Ms. Odom met Scott Kiesig in November 1997 after she moved to Idaho. She married him on January 31, 1998, and changed her surname to Kiesig.

in danger as long as they were in Mr. Odom's custody.[3]  Following a November 2, 1998 hearing, the trial court declined to order an independent psychiatric examination of the parties or their children or to hold an emergency hearing regarding temporary custody of the children.  However, the trial court granted Ms. Kiesig's request for an early hearing and set the trial of all pending issues for December 3-4, 1998.[4]

The trial court handed down its ruling from the bench on December 4, 1998, following a two-day hearing.  After observing that the children "have been through a lot with their parents fighting like they are," the court found that the parties' daughter had been sexually abused by her older half-brother both in West Virginia and in Idaho.  Accordingly, the trial court concluded that there had been a material change in the children's circumstances and that the children would be "in danger" if they returned to Idaho to live with their half-brother.  The trial court also described Ms. Kiesig as "vindictive" and "manipulative" and concluded that she had even attempted to solicit perjured testimony against Mr. Odom.[5]  After concluding that Ms. Kiesig was untruthful, the court concluded that Ms. Kiesig had moved first to West Virginia and then to Idaho to frustrate Mr. Odom's efforts to visit with the children.

Based on these findings, the trial court entered its final order on December 31, 1998. Therein, the court granted Mr. Odom sole custody of the parties' three children.  The court also directed Ms. Kiesig to pay (1) $170 per week in child support, (2) $2,500 of Mr. Odom's legal expenses, and (3) the transportation costs for the children's visitation in Idaho.  Finally, the trial court prohibited all persons, except the children's therapist, from discussing with the children the events that had precipitated this dispute. On February 1, 1999, Mr. Odom moved to amend the final order to provide that the children's visitation in Idaho must be exercised in the absence of their older half-brother. Over Ms. Kiesig's objection, the trial court entered an order on March 5, 1999, stating that the older half-brother could not be present, or even in the same house, when the children were visiting their mother.

The final skirmish between the parties began on March 23, 1999, when Mr. Odom requested the trial court to delay or cancel his daughter's spring visitation with her mother because it would cause the child "immediate and irreparable harm."  To support this assertion, Mr. Odom attached to his motion an affidavit from the family's psychologist describing the child's reaction to the news that she and her brothers would be traveling to Idaho to visit their mother.  The psychologist stated that forcing the child to travel to Idaho "could well be her undoing" because she did not believe her

---

[3] According to the motion, this information related to: (1) Mr. Odom's "pornographic addiction," (2) the January 4, 1998 incident involving Mr. Odom's service revolver, (3) the TBI's investigation regarding Ms. Kiesig's 1996 charges that Mr. Odom had sexually abused his daughter, and (4) other inappropriate conduct by Mr. Odom.

[4] On November 16, 1998, this court denied Ms. Kiesig's application for a Tenn. R. App. P. 10 appeal from the trial court's November 2, 1998 decision.  *Kiesig v. Odom*, No. 01A01-9811-CH-00590 (Tenn. Ct. App. Nov. 20, 1998).

[5] The trial court specifically found that the parties' daughter had complained to Ms. Kiesig in 1996 about her half-brother's conduct and that Ms. Kiesig had instructed her daughter to say that Mr. Odom did it.  The trial court also pointed to Ms. Kiesig's efforts to enlist the assistance of the current Ms. Odom's former husband.

mother would protect her from her half-brother and that "it is possible that [the child] could even have to be institutionalized because of the extreme anxiety, fear and mental stress that she is going through as a result of this trip to visit her mother." Ms. Kiesig opposed Mr. Odom's request. On March 29, 1999, following a hearing, the trial court declined to delay or cancel the child's scheduled visitation with Ms. Kiesig. However, the court ordered that "if the child . . . becomes upset during the visit or if alternatively she expresses a desire to do so, she is to be allowed to speak with Dr. Linda Pitts, by telephone without any interference or without any 'tapping' in. If the child . . . becomes upset during the visit, the visit shall be terminated and the child shall be returned to the father in Dickson County, Tennessee." This appeal ensued.

## II.
### THE APPOINTMENT OF AN INDEPENDENT PSYCHIATRIST

Ms. Kiesig first contends that the trial court infringed upon her due process rights by denying her pre-trial motion for the appointment of an independent psychiatrist to evaluate the parties and their children as well as her motion made on the morning of trial to have the parties undergo a psychological examination. Based on the circumstances of this case, we have concluded that the trial court's denial of Ms. Kiesig's motion was not reversible error.

### A.

Prior to the adoption of the Tennessee Rules of Civil Procedure, the Tennessee Supreme Court recognized the existence of a common-law power of courts to compel litigants to submit to physical examinations. *Williams v. Chattanooga Iron Works*, 131 Tenn. 683, 691, 176 S.W. 1031, 1033-34 (1915). However, the Court recognized that the courts should exercise this power "with great restraint and with careful attention to the rights of the plaintiff." Accordingly, the Court held that plaintiffs should not be required to undergo a physical examination unless the party seeking the examination has demonstrated "that it is necessary in order that justice may be done." *Williams v. Chattanooga Iron Works*, 131 Tenn. at 694-95, 176 S.W. at 1034; *see also Union Pacific Ry. v. Botsford*, 141 U.S. 250, 259, 11 S. Ct. 1000, 1004 (1891) (Brewer, J., dissenting) (stating that truth and justice are more sacred than any personal consideration).

With the advent in 1971 of the Tennessee Rules of Civil Procedure, Tennessee continued the common-law rule in Tenn. R. Civ. P. 35 which, then and now, is patterned after Fed. R. Civ. P. 35.[6] Tenn. R. Civ. P. 35.01 contains no limitation on the actions to which it applies; therefore it is available in any pending civil proceeding to which the Tennessee Rules of Civil Procedure apply. Few precedents construing Tenn. R. Civ. P. 35 exist because physical and mental examinations of parties or persons in the custody of a party are usually done by agreement without the intervention of the courts. 4 Nancy F. MacLean, *Tennessee Practice* § 35:2 (3d ed. 2000). In fact, commentators

---

[6]Decisions of the federal courts construing analogous federal rules of procedure can provide helpful guidance in interpreting our own rules. *Frazier v. East Tenn. Baptist Hosp.*, 55 S.W.3d 925, 928 (Tenn. 2001); *Byrd v. Hall*, 847 S.W.2d 208, 211 n. 2 (Tenn. 1993); *Pacific Eastern Corp. v. Gulf Life Holding Co.*, 902 S.W.2d 946, 952 n.7 (Tenn. Ct. App. 1995).

generally attribute the ease of these agreements to the existence of Rule 35.  8A Charles A. Wright, et al., *Federal Practice and Procedure* § 2234, at 474 (2d ed. 1994) ("*Federal Practice and Procedure*").

Any type of physical or mental examination entails an invasion of privacy.  *Lombardo v. Holdridge*, 491 A.2d 1125, 1126 (Conn. Super. Ct. 1985); *Russenberger v. Russenberger*, 623 So. 2d 1244, 1245 (Fla. Dist. Ct. App. 1993); *Uhl v. C.H. Shoemaker & Son, Inc.*, 637 A.2d 1358, 1362-63 (Pa. Super. Ct. 1994).  Accordingly, rules like Tenn. R. Civ. P. 35 balance the interests of personal privacy with the interest of truth and justice.  *Lowe v. Philadelphia Newspapers, Inc.*, 101 F.R.D. 296, 298 (E.D. Pa. 1983); *Acocella v. Montauk Oil Transp. Corp.*, 614 F. Supp. 1437, 1439 (S.D.N.Y. 1985); *Avila v. Superior Court in and for County of Maricopa*, 816 P.2d 946, 948-49 (Ariz. Ct. App. 1991).

To invoke Tenn. R. Civ. P. 35.01 successfully, a moving party must establish two things.  First, in the language of the rule, the moving party must establish that the mental or physical condition of a party or a person in the custody of a party is "in controversy."  Second, the moving party must establish that "good cause" exists for the physical or mental examination.  Rather than being mere formalities, the "in controversy" and "good cause" requirements distinguish Tenn. R. Civ. P. 35 from the other discovery rules.  No other rule governing pre-trial discovery contains these requirements.

In light of these two requirements, a party seeking a Tenn. R. Civ. P. 35 order must establish more than that the physical or mental examination might lead to relevant information.  *Guilford Nat'l Bank v. Southern Ry.*, 297 F.2d 921, 924 (4th Cir. 1962).  It must also establish need.  4A James W. Moore, et. al., *Moore's Federal Practice and Procedure* ¶ 35.03[5] (2d ed. 1996).  Explaining the significance of the "in controversy" and "good cause" requirements, the United States Supreme Court has noted:

> They are not met by mere conclusory allegations of the pleadings – nor by mere relevance to the case – but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination.  Obviously, what may be good cause for one type of examination may not be so for another.  The ability of the movant to obtain the desired information by other means is also relevant.

*Schlagenhauf v. Holder*, 379 U.S. 104, 118, 85 S. Ct. 234, 242-43 (1964).

We turn first to Tenn. R. Civ. P. 35's "in controversy" requirement.  A party's physical or mental condition may be placed "in controversy" in two ways.  First, the party himself or herself

may place his or her condition in controversy.[7]  Second, a party may place another party's physical or mental condition "in controversy" even if the party him or herself has not.  The latter circumstance calls for a discriminating application of Tenn. R. Civ. P. 35's requirements. *Schlagenhauf v. Holder*, 379 U.S. at 118-19, 85 S. Ct. at 243; *Federal Practice and Procedure* § 2234.1, at 480.

The "good cause" requirement in Tenn. R. Civ. P. 35 places the burden on the moving party to demonstrate that the requested examination is needed.  It requires the court to consider whether the information sought is available through other discovery techniques and whether the available information is adequate. *Caban ex rel. Crespo v. 600 E. 21st St. Co.*, 200 F.R.D. 176, 182 (E.D.N.Y. 2001); *Lahr v. Fulbright & Jaworski, L.L.P.*, 164 F.R.D. 196, 200 (N.D. Tex. 1995); *Marroni v. Matey*, 82 F.R.D. 371, 372 (E.D. Pa. 1979); *Ex Parte Wal-Mart Stores, Inc.*, 729 So. 2d 294, 298 (Ala. 1999).  Thus, requests for examinations under Tenn. R. Civ. P. 35 should be considered in the context of the other discovery in the case.

Federal courts have illustrated the sort of discovery process that will lead to the satisfaction of the "good cause" requirement.  In cases where a party's physical or mental condition is in controversy, the courts anticipate that prior to filing a Rule 35 motion, the moving party will attempt to discover whether the party whose condition is in controversy has already been examined.[8]  If the moving party learns that the party whose condition is in controversy has not been examined, it may use the lack of an examination to establish good cause for ordering a Rule 35 examination.  If the moving party learns that examinations have been conducted, it can then discover the records and results of these examinations.[9]

If formal or informal discovery leads to the production of existing examination records, the moving party will not be entitled to insist on further examinations unless it can demonstrate that the prior examinations are insufficient for its purposes.  Thus, for example, a moving party may be able to establish good cause for a Rule 35 examination when it demonstrates that it has discovered the results of the examinations already performed on the party whose condition is in controversy and that the conclusions of its own experts based on these records is contrary to the opinions of the other party's experts. *Anson v. Fickel*, 110 F.R.D. 184, 186 (N.D. Ind. 1986).  There are, of course, other reasons for ordering a Rule 35 examination.  For example, the moving party's experts may disagree with the methodology of the other party's experts or may have concluded that the prior examinations are materially incomplete.

---

[7] For example, a plaintiff seeking damages for physical injury or emotional distress puts his or her physical or mental condition "in controversy."  By the same token, a defendant who asserts his or her physical or mental condition as a defense to an action places his or her condition in controversy.

[8] This discovery may take place either informally by a simple inquiry or more formally through interrogatories under Rule 33 or depositions under Rules 30 or 31.

[9] This discovery may also take place informally simply by requesting counsel to provide copies of the examination records.  It may also be pursued more formally through depositions under Rules 30 and 31 or requests for the production of documents under Rule 34.

Proceedings involving Tenn. R. Civ. P. 35 motions are intensely fact-specific. *Federal Practice and Procedure* § 2234.1, at 482. There may be circumstances where the pleadings themselves will provide the information needed to perform the sort of analysis that Tenn. R. Civ. P. 35 requires. However, as the United States Supreme Court has noted:

> This does not, of course, mean that the movant must prove his case on the merits in order to meet the requirements for a mental or physical examination. Nor does it mean that an evidentiary hearing is required in all cases. This may be necessary in some cases, but in other cases the showing could be made by affidavit or other usual methods short of a hearing. It does mean, though, that the movant must produce sufficient information, by whatever means, so that the district judge can fulfill his [or her] function mandated by the Rule.

*Schlagenhauf v. Holder*, 379 U.S. at 119, 85 S. Ct. at 243.

Moving parties do not have an absolute right to a Tenn. R. Civ. P. 35 examination of another party or a person in another party's custody. *Newton v. Ceasar*, No. M2000-01117-COA-R10-CV, 2000 WL 863447, at *2 (Tenn. Ct. App. June 29, 2000) (No Tenn. R. App. P. 11 application filed); *Federal Practice and Procedure* § 2234.1, at 478. Like other pre-trial discovery matters,[10] the trial courts have wide discretion with regard to granting or denying Tenn. R. Civ. P. 35 motions. *Sanden v. Mayo Clinic*, 495 F.2d 221, 225 (8th Cir. 1974); *Coca-Cola Bottling Co. v. Torres*, 255 F.2d 149, 153 (1st Cir. 1958); *Neal v. Siegel-Robert, Inc.*, 171 F.R.D. 264, 266 (E.D. Mo. 1996); *Great West Life Assur. Co. v. Levithan*, 153 F.R.D. 74, 76 (E.D. Pa. 1983). However, to exercise their discretion properly, trial courts must analyze each motion on a case-by-case basis[11] and must analyze the facts and procedural posture of the case in a careful and "discriminating" manner to determine whether the party seeking the physical or mental examination under Tenn. R. Civ. P. 35 has adequately demonstrated that it has satisfied the rule's requirements.

## B.

We now apply these principles to the circumstances of this case. The threshold question is whether the mental conditions of Mr. Odom, Ms. Kiesig, or their three children were "in controversy" in this proceeding. Because the mental conditions of parents and children are not necessarily in controversy in every custody proceeding, we must analyze the parties' claims and defenses, as well as the facts brought to the trial court's attention that might support a conclusion that the mental condition of these particular parties and these particular children were "in controversy."

---

[10] *Vythoulkas v. Vanderbilt Univ. Hosp.*, 693 S.W.2d 350, 356 (Tenn. Ct. App. 1985) (holding that the course of pre-trial discovery is, in large measure, left to the discretion of the trial judge).

[11] *Ragge v. MCA/Universal Studios*, 165 F.R.D. 605, 608 (C.D. Cal. 1995); *Curtis v. Express, Inc.*, 868 F. Supp. 467, 469 (N.D.N.Y. 1994).

Mr. Odom's petition to change custody rests on two grounds – the sexual and physical abuse of his children by their older half-brother and Ms. Kiesig's repeated efforts to interfere with his visitation rights. These claims do not necessarily call either Mr. Odom's, Ms. Kiesig's, or their children's mental condition into question. Either claim, if factually substantiated, would provide ample proof of a material change in the children's circumstances that would warrant re-examining the existing custody arrangement notwithstanding the parents' or the children's mental condition.[12] Accordingly, we find that Mr. Odom's petitions did not place the mental condition of the parties or their children in controversy for Tenn. R. Civ. P. 35.01 purposes.

Ms. Kiesig's defense to Mr. Odom's petition is two-fold. First, she asserts that the allegations that her son had sexually and physically abused his younger half-siblings over a two-year period are false. Second, she asserts that Mr. Odom is comparatively less fit than she to have custody of the children. To support this assertion, she points to Mr. Odom's alleged adultery during their marriage, his alleged addiction to pornography, especially pornography involving homosexuality, bestiality, and mutilation, and his mental instability. The mental instability claim stems from Mr. Odom's continuing need for marital counseling, allegations of domestic violence and verbal abuse, and the January 4, 1998 incident involving Mr. Odom's service revolver.

Ms. Kiesig's denial that her son physically and sexually abused his half-siblings does not place the children's mental condition in controversy. If these children have been either sexually or physically abused, that abuse alone, notwithstanding their current mental condition, amounts to a material enough change in their circumstances to reopen the question of custody. By making this defense, Ms. Kiesig is not so much placing the children's mental condition in controversy, as she is arguing that the children's testimony is false. In fact, her argument, as we understand it, is that Dr. Linda Pitts, the family psychologist, and Mr. Odom have coerced or induced the children to make these false statements about their half-brother. This credibility defense could have been pursued without subjecting the children to a battery of psychological tests.[13] Accordingly, we conclude that Ms. Kiesig's denial that her son abused his half-siblings did not place the mental condition of these children in controversy for the purpose of Tenn. R. Civ. P. 35.01.

Ms. Kiesig's allegations regarding Mr. Odom's fitness to be a custodial parent present a far closer question. Notwithstanding Ms. Kiesig's almost insurmountable credibility problems, the record contains objective evidence that could call into question Mr. Odom's mental condition as it relates to his parenting skills. In addition to the troubling questions of adultery and addiction to

---

[12]This is especially true in this case because of Ms. Kiesig's adamant denial that her son had either sexually or physically abused the parties' children and her categorical refusal to consider separating the children should the parties' children be returned to her custody.

[13]For example, Ms. Kiesig could have discovered the records of Dr. Pitts's sessions with the children and could have used these records (1) to cross-examine Mr. Odom and Dr. Pitts regarding whether they coached the children, (2) to obtain other expert testimony calling Dr. Pitts's methodology into question, and (3) to insist that the children be called as witnesses and subjected to appropriate examination and cross-examination.

pornography,[14] the parties' pleadings and the pretrial discovery demonstrate (1) that Mr. Odom's relationship with both his current wife and with Ms. Kiesig had required marital counseling, (2) that Mr. Odom had become so emotionally overwrought that he had been placed on Paxil, and (3) that during an emotional outburst in January 1998, Mr. Odom had wielded his service revolver in his home in an inappropriate and unsafe manner. Accordingly, based on the facts of this case, we conclude that Ms. Kiesig has succeeded in placing Mr. Odom's mental condition in controversy for the purposes of Tenn. R. Civ. P. 35.01.

## C.

We now turn to the question of whether Ms. Kiesig established good cause for subjecting herself, Mr. Odom, and their three children to psychological testing. Two considerations guide our examination of this question – whether each person's mental condition is in controversy and whether other available discovery techniques would have enabled Ms. Kiesig to obtain the information she sought. We have determined that Ms. Kiesig failed to establish good cause for additional psychological examinations of the children because she did not demonstrate that their mental condition was in controversy and because of the discovery tactics of her lawyers. We have likewise determined that Ms. Kiesig did not establish good cause to subject Mr. Odom to additional psychological testing because her lawyers failed to demonstrate that the information they sought could not have been obtained by other means.

## 1.

Ms. Kiesig and her lawyers knew many months before trial that they planned to counter Mr. Odom's petition for change of custody by asserting that he was comparatively less fit to be the children's custodian. Ms. Kiesig had known for many years about Mr. Odom's alleged adultery with her best friend and his alleged addiction to pornography, as well as the marital counseling in which she and Mr. Odom had participated.[15] In addition, she had known since at least August 7, 1998 that Mr. Odom had taken the children to Dr. Pitts, a psychologist specializing in child abuse. She was also aware of the substance of Dr. Pitts's conclusions because they were summarized in an August 4, 1998 affidavit filed in support of Mr. Odom's motion.

Ms. Kiesig's efforts to discover the extent of Mr. Odom's and the children's involvement with Dr. Pitts were far from robust. As far as this record shows, she did not even begin discovery

---

[14] On this score, we find that the trial court erred by repeatedly refusing to consider for any purpose Mr. Odom's conduct prior to the May 26, 1995 divorce decree. As we understand the trial court's reasoning, the court decided that Ms. Kiesig had somehow waived her right to present or even rely on this evidence by signing a marital dissolution agreement rather than insisting on a full-blown trial. We disagree with this reasoning, especially when the safety and well-being of children are concerned. Past behavior is illustrative and relevant with regard to a person's current psychological condition.

[15] In support of her opposition to Mr. Odom's August 1998 request for custody of the children, Ms. Kiesig provided the trial court with a copy of a psychologist's May 3, 1995 letter to her former lawyer detailing Mr. Odom's admissions regarding these matters.

until November 10, 1998 – more than three months after she became aware of Dr. Pitts's activities and less than one month before trial. Instead, on October 3, 1998, her lawyers filed a "motion for appointment of independent psychiatrist and psychological/psychiatric examination."[16] Ms. Kiesig did not obtain a hearing on her motion until November 2, 1998. While we have no record of what transpired at that hearing, the record reflects that the trial court denied the motion at the conclusion of the hearing without taking the matter under advisement.

When the trial commenced on December 3, 1998, one of Ms. Kiesig's lawyers renewed the motion for an independent psychological examination of the parties and their children. After noting the trial court's concern about subjecting the children to unnecessary stress, Ms. Kiesig's lawyer argued that "at the very least" the parents should "undergo a thorough psychological examination" according to Tenn. R. Civ. P. 35.01.[17] Rather than denying the motion, the trial court stated that it had "wide latitude in cases like this" and that it would decide about additional psychological testing and about interviewing the children in chambers "after I hear the proof in the case." Ms. Kiesig renewed her motion for independent psychological examinations after both sides rested. The trial court again denied the motion, stating "I've heard enough in this case. I've heard all kinds of evaluations. I think I've heard plenty."

**2.**

Based upon this record, we conclude that the trial court properly declined to order psychological examinations of the parties' three children. We concur with the trial court's expressed concern about unnecessarily exposing the children to additional stress. In addition, we find that psychological testing pursuant to Tenn. R. Civ. P. 35.01 was not warranted because Ms. Kiesig failed to demonstrate convincingly that the children's mental condition was "in controversy" in this proceeding.

Turning to the testing of the parties themselves, the record contains no basis for requiring Ms. Kiesig to undergo psychological testing because her mental condition was not "in controversy." While Ms. Kiesig succeeded in placing Mr. Odom's mental condition "in controversy," she failed to demonstrate that the information she sought to obtain by this testing could not have been obtained through other means. She also failed to explain what she anticipated this additional testing would have revealed or confirmed.[18] Testing under Tenn. R. Civ. P. 35 is not intended to provide the same

---

[16] Unfortunately, this motion does not state with particularity the grounds or legal authority upon which it is made as required by Tenn. R. Civ. P. 7.02. Because it requests the appointment of an "independent" psychiatrist, the motion could be construed as either a Tenn. R. Civ. P. 35.01 or a Tenn. R. Evid. 706 motion. It is also conceivable that Ms. Kiesig could have been seeking the appointment of a state-paid psychiatrist because of her belief that this proceeding was interfering with her parental rights.

[17] As far as this record shows, this is the first specific reference to Tenn. R. Civ. P. 35.01 in this case.

[18] Other than Ms. Kiesig's arguments and innuendos, the record contains no basis for concluding that the children would be exposed to danger if they were placed in Mr. Odom's custody. There is surprisingly little direct
(continued...)

sort of fishing expedition for relevant information that is provided by the other discovery rules. Accordingly, we cannot conclude, based on this record, that the trial court abused its discretion by denying Ms. Kiesig's motion for independent testing.[19]

## III.
### THE ROLE OF DR. PITTS DURING THE SPRING 1999 VISITATION

As a final matter, Ms. Kiesig takes issue with the trial court's March 29, 1999 order regarding the Spring 1999 visitation. She asserts that the trial court improperly delegated its judicial power to Dr. Pitts to terminate the parties' daughter's visitation. Even though this issue is moot because the Spring 1999 visitation has long since concluded, we will address the question because it involves the sort of issue that is capable of repetition.[20]

The March 29, 1999 order arose out of a dispute over whether the parties' daughter should travel to Idaho for her scheduled visitation with Ms. Kiesig during the spring of 1999. Mr. Odom requested the trial court to delay or cancel this visitation because Dr. Pitts had concluded:

> What needs to be realized is that with the abuse . . . [the child] has suffered, she cannot be expected to do well in such a short period of time. Her mother has taken no action to show her that she believes that she was sexually abused, and in fact has stated to the contrary. [The child] . . . realizing this, fears that her mother will not protect her from . . . [her older half-brother] when she goes to visit her and her mother has shown her no reason whatsoever that her fears are not justified. The fact that there is a [c]ourt [o]rder that . . . [the older half-brother] cannot be in the house or in . . . [the child's] presence does not in any way alleviate . . . [her] fears because her mother told her before that she would protect her from . . . [her half-brother] and

[18] (...continued)
evidence in this record regarding Mr. Odom's fitness to be the custodial parent.

[19] Even if we were to conclude that the trial court erred by denying Ms. Kiesig's Tenn. R. Civ. P. 35.01 motion, which we do not, the relief for this error would not include returning the children to Ms. Kiesig's custody. No examination of Mr. Odom would undermine the strength of the evidence that the children's circumstances had changed since November 1995 and that these changes were material enough to warrant removing the children from Ms. Kiesig's custody. At most, the results of a psychological examination of Mr. Odom would have undermined the trial court's decision to place the children in Mr. Odom's custody. Our decision in this case does not foreclose the custody question. As long as any of the children remain minors, Ms. Kiesig may return to court seeking a change of custody based upon material changes in the children's circumstances occurring after December 31, 1998.

[20] The courts have carved out an exception to the mootness doctrine for cases involving issues that are capable of repetition but will evade judicial review. *State ex rel Anglin v. Mitchell*, 596 S.W.2d 779, 782 (Tenn. 1980); *New Riviera Arts Theatre v. State*, 219 Tenn. 652, 658, 412 S.W.2d 890, 893 (1967); *LaRouche v. Crowell*, 709 S.W.2d 585, 587-88 (Tenn. Ct. App. 1985).

she did not do so and . . . [the child] is terrified that her mother will not protect her this time.

For her part, Ms. Kiesig responded by asserting that Mr. Odom's motion was "in effect asking for termination of . . . [her] parental rights without [d]ue [p]rocess" and by assuring the trial court that "[t]he half-brother will not be in contact with any of the children during their visits with their mother and other half-brother until the court is satisfied that there is no danger to the children." Based on this assurance, the trial court filed its March 29, 1999 order imposing the following restrictions on the parties' daughter's spring 1999 visitation with Ms. Kiesig:

> if the child . . . becomes upset during the visit or if alternatively she expresses a desire to do so, she is to be allowed to speak with Dr. Linda Pitts, by telephone without any interference or without any 'tapping in.' If the child . . . becomes upset during the visit, the visit shall be terminated and the child shall be returned to the father in Dickson County, Tennessee.

While we find that Dr. Pitts's March 22, 1999 affidavit provided the trial court with grounds to delay the spring 1999 visitation, we will not second-guess the trial court's decision to permit the visitation to proceed in order to maintain the relationship between Ms. Kiesig and her daughter. Likewise, we do not construe the safeguard in the trial court's March 29, 1999 order as some sort of improper delegation of judicial power to Dr. Pitts. As we construe the order, the trial court directed that if the child became upset during her visit, Ms. Kiesig should permit her daughter to speak to Dr. Pitts and should terminate visitation. If Ms. Kiesig did not believe her daughter was upset, then she was not required to contact Dr. Pitts unless requested to by the child. Thus, the order implicitly assumed that Ms. Kiesig, rather than Dr. Pitts, would be the initial arbiter of whether her daughter was upset enough to warrant further action, such as terminating visitation or contacting Dr. Pitts.

**IV.**

We affirm the judgment and remand the case to the trial court for whatever further proceedings may be required. We also tax the costs of this appeal to Mary Jo Kiesig and her surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE